**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

**UNSEALED
PER ARREST**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

NOV 2 3 2010

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **10 CR 814** |
| v. | § | CRIMINAL NO. |
| | § | |
| MALCHUS IRVIN BONCAMPER, | § | 18 U.S.C. § 1349 |
| | § | 18 U.S.C. § 1343 |
| Defendant. | § | 18 U.S.C. § 1956(h) |

## INDICTMENT

THE GRAND JURY CHARGES:

At all times material to this Indictment:

### COUNT ONE
(Conspiracy to Commit Wire Fraud)

**A.** **INTRODUCTION**

1.      Defendant **MALCHUS IRVIN BONCAMPER** was a Chartered Certified

Accountant in the Federation of St. Kitts and Nevis in the West Indies. Defendant BONCAMPER

operated a business that formed "shell" companies in St. Kitts and Nevis, including insurance

companies. Defendant BONCAMPER also prepared financial statements for such companies and

claimed to audit them. In 1995, defendant BONCAMPER was ordered by the Texas Department

of Insurance ("TDI") to cease and desist from engaging in the business of insurance in an

unauthorized manner in the State of Texas. In 1999, defendant BONCAMPER applied to register

a company called Commercial Acceptance Indemnity Ltd. ("Commercial") under the Companies Act

of 1996 in St. Kitts. Authorities denied the application because the word "Indemnity" in

Commercial's name implied that it was engaged in the business of insurance when that was not the

case. Thereafter, defendant BONCAMPER arranged for a company with the same name to be incorporated in nearby Nevis.

**Monarch**

2.      Monarch Insurance Services ("Monarch") was an entity that sold insurance. Monarch's office was located in Houston, Texas.

3.      Starting in or about 2000, Monarch offered liability insurance to companies that operated nursing homes and other businesses. The insurance policies were supposedly underwritten by legitimate insurance companies such as Maryland Casualty. However, Monarch did not obtain real insurance policies, and the nursing homes received no insurance.

4.      Starting in or about 2001, Monarch began selling insurance policies purportedly issued by Westchester Surplus Lines, Inc. ("Westchester") and reinsured by PT ING Insurance Indonesia ("ING"). In fact, Westchester never issued any insurance policies to customers of Monarch, and ING never issued or reinsured any such policies.

5.      Later in 2001, Monarch announced that Westchester and ING had been replaced by an insurance company called PT Asuransi Allianz Utama Indonesia ("Allianz"). In fact, Allianz never issued any insurance policies to customers of Monarch and never reinsured any such policies.

6.      In 2002, the TDI accused Monarch of having sold fake insurance and alleged that the company's owner, unindicted co-conspirator C.P., engaged in fraud and willfully violated Texas insurance laws.

**IPOA**

7.      On or about September 13, 2002, International Property Owners Association Ltd. ("IPOA") was incorporated in Belize.

8.     United Assurance Company S.A. ("UAC") was a Nicaraguan company that purported to be an insurance broker. UAC was controlled by unindicted co-conspirator S.M.

9.     Beginning sometime in late 2002, and operating from Monarch's old office in Houston, Texas, IPOA marketed a liability insurance policy that supposedly was issued, through UAC, by companies such as Commonwealth Insurance Company of Canada ("Commonwealth") and Great Domestic Insurance Company of the Philippines ("Great Domestic") and supposedly was reinsured by PT Asuransi Mitsui Sumitomo Indonesia ("Mitsui"). In fact, neither Commonwealth nor Great Domestic issued an insurance policy to IPOA or UAC and Mitsui never reinsured any such policy.

10.    On or about April 30, 2003, TDI ordered IPOA, UAC and unindicted co-conspirator C.P. to stop selling insurance in Texas because the policies they were selling were fake.

**GPOA**

11.    On or about May 7, 2003, IPOA announced that it was terminating its insurance program because of "contractual disagreements" with Great Domestic but said that IPOA's customers could obtain insurance through a new outfit called Global Property Owners Association, Inc. ("GPOA"). IPOA said that insurance policies would be issued by Heritage Mutual Surety Limited ("Heritage"), in St. Vincent and the Grenadines, and that reinsurance would be provided by Mitsui in Indonesia.

12.    On or about June 10, 2003, unindicted co-conspirator S.M. incorporated GPOA in Florida.

13.    Beginning around June, 2003, and operating from IPOA's old office in Houston, Texas, GPOA marketed a liability insurance policy that supposedly was issued by Heritage and reinsured by Mitsui. Once again, the insurance was fake. Heritage was a fraudulent company that

lacked the ability to pay insurance claims and Mitsui never reinsured any Heritage policy.

14.     On or about July 3, 2003, defendant BONCAMPER arranged for United Re-insurance Group Ltd. ("United") to be incorporated in Nevis. The articles of incorporation stated that United was established "[t]o undertake and carry on the business of all types and varieties whatsoever of insurance ..." and for other purposes.

15.     On or about July 3, 2003, defendant BONCAMPER sold United to unindicted co-conspirator S.M., the owner of GPOA. Thereafter, defendant BONCAMPER served as United's secretary and agent, and United used his office address in St. Kitts.

16.     On or about August 15, 2003, defendant BONCAMPER created financial statements and an "auditor's report" for a Nevis company that defendant BONCAMPER had previously owned called Polaris International Ltd. ("Polaris"). The financial statements showed that Polaris owned $10,139,600 worth of Eurobonds which were issued by London-based Morganbank plc and few liabilities. The auditor's report stated that defendant BONCAMPER's accounting firm had audited the Polaris financial statements "in accordance with International Standards of Auditing" and that "In our opinion, the financial statements present fairly, in all material respects, the financial position of the company ...". In fact, defendant BONCAMPER did not conduct an "audit" in accordance with International Standards of Auditing, Morganbank plc was a fraudulent, recently-formed company and the Eurobonds were worthless.

17.     On or about September 15, 2003, GPOA announced that it had secured insurance coverage from United and reinsurance through Polaris.

18.     On or about September 19, 2003, GPOA, through an insurance broker in Houston, Texas, offered to sell liability insurance to a restaurant and bar on Lake George, New York, called Shoreline Restaurant, Inc., and King Neptune, Inc. The insurance was to be provided by Polaris.

19.     In or about September, 2003, an unknown co-conspirator prepared financial statements for Polaris dated August 31, 2003. These financial statements showed that Polaris had assets worth 174,080,300 Euros and was owned by Group Suisse Alliance AG, a company with "EURO 4 billion under management". The financial statements included a "Report of Independent Accountants" prepared by Bankhaus Schweizer Bundnisses AG that stated as follows: "In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, stockholders equity, cash flows and comprehensive income present fairly, in all material respects, the consolidated financial position of Polaris International Limited, at August 31, 2003 ... We conducted our audits of these statements in accordance with auditing standards in accordance with European Commission Recommendation (16 May 2002) Statutory Auditors' Independence ..." In fact, the August 31, 2003, Polaris financial statements were completely fraudulent and neither Group Suisse Alliance AG nor Bankhaus Schweizer Bundnisses AG actually existed.

20.     On or about October 3, 2003, an insurance broker in Houston, Texas, faxed part of the fake August 31, 2003, Polaris financial statement to the owner of Shoreline Restaurant, Inc., and King Neptune, Inc., in Lake George, New York.

21.     From on or about October 30, 2003, through on or about November 10, 2003, defendant BONCAMPER arranged for fraudulent Morganbank plc Eurobonds to be issued to Commercial and also to a company that did not yet exist called Brentwood Re Ltd. ("Brentwood"). The bonds were purportedly guaranteed by an entity, Bankhaus Suisse Alliance AG, that, in fact, did not exist. Unindicted co-conspirator M.D. described the bond issue as "balance sheet re-engineering".

22.     On or about November 6, 2003, defendant BONCAMPER created financial statements and an "auditor's report" for Commercial. The financial statements showed that

Commercial had assets worth $28,474,000 and no liabilities. The auditor's report stated that defendant BONCAMPER's accounting firm had audited the Commercial financial statements "in accordance with International Standards of Auditing" and that "In our opinion, the financial statements present fairly, in all material respects, the financial position of the company ...". In fact, defendant BONCAMPER did not conduct an "audit" in accordance with International Standards of Auditing and the only assets shown on the Commercial financial statement, Eurobonds with a stated value of $28,474,000, were worthless.

23.     On or about November 24, 2003, defendant BONCAMPER arranged for Brentwood to be incorporated in St. Kitts.

24.     On or about December 6, 2003, defendant BONCAMPER created financial statements and an "auditor's report" for Brentwood. The financial statements showed that Brentwood had assets worth $23,060,479 and no liabilities. The auditor's report stated that defendant BONCAMPER's accounting firm had audited the Brentwood financial statements "in accordance with International Standards of Auditing" and that "In our opinion, the financial statements present fairly, in all material respects, the financial position of the company ...". In fact, defendant BONCAMPER did not conduct an "audit" in accordance with International Standards of Auditing and the only assets shown on Brentwood's financial statement, Eurobonds with a stated value of $23,060,479, were worthless.

25.     On or about December 15, 2003, defendant BONCAMPER wrote a letter about the August 31, 2003, Polaris financial statements that had been "audited" by fake Swiss accountants (Bankhaus Schweizer Bundnisses AG). Defendant BONCAMPER stated "I have performed a proper inquiry which includes both personal interviews and the review of relevant documents. This was done in accordance with generally accepted auditing standards for audit purposes." The letter

concluded: "We have formed the opinion that you may rely on the financial information as presented in the referred here to audit."

26.     On or about December 23, 2003, GPOA emailed a proposal for United to provide liability insurance to the owner of King Neptune, Inc., in Lake George, New York. King Neptune, Inc., accepted the proposal and purchased an insurance policy written by United.

27.     On or about May 13, 2004, GPOA faxed to the owners of King Neptune, Inc., a proposal for United to provide liability insurance for a separate business, called Shoreline Cruises, Inc., that operated tour boats on Lake George, New York. On or about May 21, 2004, GPOA emailed to Shoreline Cruises, Inc., a revised proposal for United to provide liability insurance for the company's boats. The proposal included Marine Liability coverage for a 40-foot Dyer excursion boat called the *Ethan Allen* that Shoreline Cruises, Inc., used to take tourists sightseeing on Lake George. Shoreline Cruises, Inc., accepted the proposal and purchased an one-year insurance policy written by United.

28.     On or about July 1, 2004, defendant BONCAMPER gave unindicted co-conspirator S.M. powers of attorney that put him in control of Commercial and Brentwood.

29.     On or about July 27, 2004, defendant BONCAMPER wrote a letter addressed to Commercial that stated as follows:

> "... It has been duly noted that your agencies may need some additional assurances that there are adequate arrangements in place to cover the risks assumed by the Company, and therefore it can be acknowledge that there does indeed exists a reciprocal quota share arrangement between Commercial Acceptance Indemnity Ltd. and Brentwood Re Limited, which provide a combined statement in excess of $50 million USD. The excess slip in place with United Reinsurance Group Limited commencing August 1, 2004, has been reviewed by this firm and appears to be in order, not being an Insurance underwriter I am not sure how the additional treaty between United Re and Polaris International relate to your associates query, and can thus only comment that one does exist. ..."

30.     In or about October, 2004, an unindicted co-conspirator, C.W., sent the following

fraudulent documents from GPOA, in Houston, Texas, to Shoreline Cruises, Inc., in Lake George, New York: defendant BONCAMPER's July 27, 2004, letter; the fake Swiss-audited August 31, 2003, Polaris financial statement; defendant BONCAMPER's November 6, 2003, "auditor's report" and financial statements for Commercial; and defendant BONCAMPER's December 6, 2003, "auditor's report" and financial statements for Brentwood.

31.     On or about April 26, 2005, GPOA faxed to Shoreline Cruises, Inc., a proposal to renew its insurance policy for the company's boats, including the *Ethan Allen*. The proposal included Marine Liability coverage. Shoreline Cruises, Inc., accepted the proposal and purchased a new insurance policy for the period May 2, 2005, through November 1, 2005.

32.     Starting on or about May 19, 2005, GPOA sold insurance policies that supposedly were issued by Builders & Contractors Assurance Company, Ltd. ("Builders") of Grand Bahamas Island and Mt. Olive, New Jersey. Like Heritage, United, Polaris, Commercial and Brentwood before it, Builders was a shell company with no ability to pay large insurance claims.

33.     On October 2, 2005, the *Ethan Allen* capsized and sank on Lake George, killing twenty elderly tourists. The tragic accident gave rise to substantial claims against Shoreline Cruises, Inc.'s liability insurance policy.

34.     On or about November 4, 2005, GPOA sent an email to Shoreline Cruises, Inc., announcing that its insurance policy had expired. A document attached to the email stated that the expired policy had been issued by Builders (as opposed to United).

35.     From in or about November, 2005, through in or about January, 2006, unindicted co-conspirator C.P. created and backdated letters and other documents to make it appear that Shoreline Cruises, Inc., had not purchased liability insurance coverage for the *Ethan Allen* while the boat was operating on Lake George, when in fact Shoreline had purchased exactly that type coverage.

36. In or about January, 2006, United was presented with claims arising from the *Ethan Allen* tragedy. United did not pay the claims, and lacked the financial ability to pay them. Likewise, Polaris, Commercial, Brentwood and Builders did not, and could not, pay the claims.

## B. THE CONSPIRACY

37. From in or about 1999 through present, in the Southern District of Texas and elsewhere, the defendant,

### MALCHUS IRVIN BONCAMPER,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit an offense against the United States, that is: to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

## C. PURPOSE OF THE CONSPIRACY

38. It was a purpose of the conspiracy that the defendant and co-conspirators would enrich themselves with money from the sale of fraudulent insurance policies.

## D. MANNER AND MEANS OF THE CONSPIRACY

39. In order to accomplish the purpose of the conspiracy, the defendant and co-conspirators:

    a. ignored and evaded insurance rules and regulations designed to protect consumers;

    b. engaged in the business of insurance in the State of Texas without authorization after

being ordered not to do so by the TDI;

      c.      issued fake policies in the name of real insurance companies that had not authorized the policies;

      d.      created shell companies with few or no assets in places such as Belize, Nicaragua, St. Kitts, Nevis, St. Vincent and The Bahamas for the purpose of offering insurance and re-insurance for customers in the United States;

      e.      created financial statements in order to mislead purchasers of insurance about the financial strength and resources of the foreign insurance companies;

      f.      falsely claimed to have audited financial statements of the foreign insurance companies "in accordance with International Standards of Auditing";

      g.      expressed the opinion that such financial statements "present fairly, in all material aspects, the financial position of the company" when, in fact, the financial statements were highly misleading;

      h.      falsely claimed to have conducted "a proper inquiry" into a financial statement supposedly audited by Swiss accountants who were, in fact, fictitious;

      i.      expressed the opinion that information presented in the fake Swiss financial statements was reliable when, in fact, the information was fake;

      j.      sold insurance policies issued by the foreign insurance companies to businesses located in Texas and throughout the United States;

      k.      received premium money from the sale of fake and fraudulent insurance policies; and

      l.      failed to pay legitimate claims on insurance policies.

**E.**      **OVERT ACTS**

      In furtherance of the conspiracy and to achieve the purpose thereof, the defendant and his co-

conspirators, in the Southern District of Texas and elsewhere, committed and caused to be committed at least one of the following overt acts, among others:

40.     On or about September 3, 1999, defendant BONCAMPER arranged for Commercial to be incorporated in Nevis.

41.     On or about November 12, 2002, defendant BONCAMPER purchased Polaris and sold it to a new owner.

42.     On or about February 25, 2003, defendant BONCAMPER arranged for Polaris to be "re-domiciled" in Nevis.

43.     On or about July 3, 2003, defendant BONCAMPER arranged for United to be incorporated in Nevis.

44.     On or about November 24, 2003, defendant BONCAMPER arranged for Brentwood to be incorporated in St. Kitts.

45.     On or about July 1, 2004, defendant BONCAMPER gave unindicted co-conspirator S.M. powers of attorney that gave him control of Commercial and Brentwood.

46.     In or about October, 2004, unindicted co-conspirator C.W. sent the following fraudulent documents from GPOA, in Houston, Texas, to Shoreline Cruises, Inc., in Lake George, New York: defendant BONCAMPER's July 27, 2004, letter; the fake Swiss-audited August 31, 2003, Polaris financial statement; defendant BONCAMPER's November 6, 2003, "auditor's report" and financial statements for Commercial; and defendant BONCAMPER's December 6, 2003, "auditor's report" and financial statements for Brentwood.

47.     On or about January 11, 2006, unindicted co-conspirator C.P. created a letter addressed to Shoreline Cruises, Inc., that was backdated to a date (October 20, 2004) before the *Ethan Allen* accident. The letter stated in part: "The money you have already saved is nothing in

comparison to having an accident with one of your boats while operating them on the lake, where they have no coverage. I strongly urge you to reconsider the quote for Marine Liability and Hull coverage on your entire fleet. I realize that you know the lake much better than we do and you have never had an accident before, but this is our recommendation to you. ..."

48.     On or about January 17, 2006, unindicted co-conspirator S.M. sent an email to unindicted co-conspirator C.P. and others that stated in part: "We are preparing a denial letter, however, the issue which exists which is in question is the basis on which we deny, and the fact that their second move will be a 'Bad Faith' claim, which with the tragic nature of the case would most likely be upheld, without same! (No need to remind that this if upheld is a criminal charge! ..."

49.     On or about January 17, 2006, unindicted co-conspirator C.P. sent an email to unindicted co-conspirator S.M. that stated in part: "I believe we have uncovered and have at the moment documentation which would suffice to allow United RE proper backup to issue a good faith denial of Shoreline Cruises, Inc. claim regarding the Ethan Allen incident. ..."

50.     On or about January 30, 2006, unindicted co-conspirator S.M. emailed a letter to defendant BONCAMPER and others. The letter, on United stationary (using a "mail drop" address in London and defendant BONCAMPER's office address in St. Kitts), was addressed to Shoreline Cruises, Inc.'s attorney. The letter stated in part: "In fact as you state it is indeed a tragedy that took place on Lake George, and for which we intend to employ exhaustive efforts to be 100% satisfied of the final disposition of the claim. We will not be bullied, intimidated or co-ercised into paying any claim that we do owe, but will most certainly satisfy the claims that we do owe. ... This being said, I will advise you that, we do have in our possession a statement from Charles Wegman, that 'Marine General Liability was offered and declined in 2004' Wegman then also asserts that he specifically described the risk Shoreline was incurring by not accepting Marine."

51.     On or about January 31, 2006, unindicted co-conspirator C.P. sent a letter from GPOA to Shoreline Cruises, Inc. The letter, which bore the forged signature of unindicted co-conspirator C.W., stated in part: "As there appears to be conflicting facts regarding the referenced claim, the company hereby requests a 'proof of claim' detailing the basis of liability in writing from the additional insured, Shoreline, pursuant to the GPOA 'Master Policy'. ... Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information may be guilty of an offense."

52.     On or about February 3, 2006, defendant BONCAMPER signed a letter certifying that United was a "duly registered reinsurance company" in good standing with the laws and registrations requirements in the Federation of St. Kitts and Nevis.

53.     On or about March 31, 2006, defendant BONCAMPER drafted a letter stating that a balance sheet for United dated December 31, 2005 (showing $270,216,365 of assets and only $4,856,095 of liabilities) "present[ed] the financial position of the company in accordance with International Accounting Standards..."

54.     On or about March 26, 2007, unindicted co-conspirator S.M. forwarded a newspaper article to defendant BONCAMPER and others that began as follows: "A cruise line and the captain of a boat that capsized on Lake George, killing 20 elderly tourists, pleaded guilty Monday to a misdemeanor charge. Shoreline Cruises and Capt. Richard Paris pleaded guilty to not having enough crew members aboard the Ethan Allen tour boat when it overturned during a fall foliage cruise on Oct. 2, 2005, throwing its passengers into the cold water of the Adirondack Mountains lake. ..."

55.     On or about March 26, 2007, defendant BONCAMPER responded: "I find this story remarkable for one reason only, that is the low fine of Usd 250. How is business your way?"

56.     On or about March 26, 2007, unindicted co-conspirator S.M. replied to defendant

BONCAMPER: "It is a very suspect plea, only a misdemeanor, but it gives cause for denial. We had been plundered because of this negative press surrounding this bloody mess, now I will commence a positive PR campaign and a new audit and we should be back in business. ..."

57.     On or about March 26, 2007, defendant BONCAMPER responded: "I welcome all possible opportunities to increase my income stream ..."

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWO - FIVE
(Wire Fraud)

### A.     INTRODUCTION

1.     Paragraphs 1 through 36 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### B.     THE SCHEME TO DEFRAUD

2.     From in or about 1999 through present, in the Southern District of Texas and elsewhere, the defendant,

### MALCHUS IRVIN BONCAMPER,

aided and abetted by others known and unknown to the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations and promises.

### C.     THE MANNER AND MEANS OF THE SCHEME

3.     Paragraph 39 of Count One of this Indictment is re-alleged and incorporated by reference herein as a description of the scheme and artifice.

### D.     THE EXECUTION OF THE SCHEME

4.     On or about the date specified below, the defendant, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause

14

to be transmitted, by means of wire communications in interstate and foreign commerce, certain

writings, signs, signals, pictures and sounds, as more particularly described below:

| Count | Date | Description |
|---|---|---|
| 2 | Nov. 10, 2003 | Email from defendant BONCAMPER, in St. Kitts, to a person in Florida describing a fake Bankhaus Suisse Alliance AG bond guarantee |
| 3 | July 2, 2004 | Email from defendant BONCAMPER, in St. Kitts, to unindicted co-conspirator S.M., in the United States, stating in part: "Okay, Steve, I want to go along with you but this deal have to make some money before too long. Monthly Cash Flow is what you promised. ... This can NOT be another Polaris!! ..." |
| 4 | July 27, 2004 | Email from unindicted co-conspirator S.M., in the United States, to defendant BONCAMPER, in St. Kitts, requesting a letter about insurance arrangements between Commercial, Brentwood, United and Polaris |
| 5 | March 26, 2007 | Email from defendant BONCAMPER, in St. Kitts, to unindicted co-conspirator S.M., in the United States, stating in part: "I welcome all possible opportunities to increase my income stream ..." |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
(Conspiracy to Launder Money)

A.    **INTRODUCTION**

1.      Paragraphs 1 through 36 of Count One of this Indictment are re-alleged and

incorporated by reference as though fully set forth herein.

B.    **THE CONSPIRACY**

2.      From in or about 1999 through present, in the Southern District of Texas and

elsewhere, the defendant,

15

**MALCHUS IRVIN BONCAMPER,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine,

conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit

offenses against the United States, that is:

a) to transport, transmit, and transfer and attempt to transport, transmit, and transfer funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of Wire Fraud, a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b) to transport, transmit, and transfer, and attempt to transport, transmit, and transfer funds involving proceeds of specified unlawful activity, that is, Wire Fraud, from a place in the United States to and through a place outside of the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

c) to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value of greater than $10,000, such property having been derived from Wire Fraud, a specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

**C.  MANNER AND MEANS OF THE CONSPIRACY**

3.  Paragraphs 40 through 57 of Count One and Paragraphs 1 through 4 of Counts Two

through Five of this Indictment are re-alleged and incorporated by reference as though fully set forth

herein as the manner and mean of this conspiracy.

**D.  OVERT ACTS**

In furtherance of the conspiracy and to achieve the purpose thereof, the defendant and his co-

conspirators, in the Southern District of Texas and elsewhere, committed and caused to be

committed at least one of the following overt acts, among others:

4.  On or about July 9, 2001, an unknown co-conspirator caused a wire transfer of

16

$437,688 from an account in the name of Monarch at Washington Mutual Bank FA, in Houston, Texas, to an account in the name of GWB Insurance Managers, Inc., at Canadian Imperial Bank of Commerce in Brossard, Canada.

5.     On or about March 6, 2003, unindicted co-conspirator S.M. caused a wire transfer of $12,000 from an account in the name of UAC at Banco De Credito Centroamericano ("Bancentro") in Managua, Nicaragua, to an account in the name of IPOA Team Ocean Ltd. at HSBC, Hong Kong.

6.     On or about May 6, 2003, defendant BONCAMPER helped Polaris open an account at The Bank of Nevis International Ltd. in Nevis.

7.     On or about July 7, 2003, an unknown co-conspirator caused a wire transfer of $10,000 from an account in the name of GPOA at Bank of America, in Miami, Florida, to an account in the name of Commercial General Capital Investments at First Caribbean International Bank in Nassau, Bahamas.

8.     On or about July 15, 2003, an unknown co-conspirator caused a wire transfer of $11,000 from an account in the name of GPOA at Bank of America, in Miami, Florida, to an account in the name of Commercial General Capital Investments at First Caribbean International Bank in Nassau, Bahamas.

9.     On or about September 8, 2003, an unknown co-conspirator caused a wire transfer of $38,586 from an account in the name of GPOA at Bank of America, in Miami, Florida, to the Polaris account at The Bank of Nevis International Ltd. in Nevis.

10.    On or about September 22, 2003, an unknown co-conspirator caused a wire transfer of $40,000 from an account in the name of GPOA at Bank of America, in Miami, Florida, to the Polaris account at The Bank of Nevis International Ltd. in Nevis.

11.     On or about April 8, 2004, defendant BONCAMPER helped United open an account at St. Kitts-Nevis-Anguilla National Bank Ltd. in St. Kitts.

12.     On or about May 4, 2004, an unknown co-conspirator caused a $3,142.42 cashiers check drawn on an account in the name of GPOA at Bank of America, in Miami, Florida, to be deposited into the United account at St. Kitts-Nevis-Anguilla National Bank Ltd. in St. Kitts.

13.     On or about June 18, 2004, an unknown co-conspirator caused a wire transfer of $7,780 from an account in the name of GPOA at Bank of America, in Miami, Florida, to the United account at St. Kitts-Nevis-Anguilla National Bank Ltd. in St. Kitts.

14.     On or about July 20, 2004, unindicted co-conspirator S.M. sent an email to unindicted co-conspirator C.P., with a copy to defendant BONCAMPER and others, stating in part: "I know you do not agree or understand the emphasis of my suggestion to get All of this OFFSHORE including Bank Accounts ASAP (yesterday) until you get your own Domestic carrier."

15.     On or about October 22, 2004, unindicted co-conspirator C.W., in Houston, Texas, caused a wire transfer of $18,100 from an account in the name of GPOA at Bank of America, in Miami, Florida, to an account in the name of UAC at Bancentro, in Managua, Nicaragua.

16.     On or about November 23, 2004, unindicted co-conspirator C.W., in Houston, Texas, caused a wire transfer of $23,593 from an account in the name of GPOA at Bank of America, in Miami, Florida, to an account in the name of UAC at Bancentro in Managua, Nicaragua.

17.     On or about April 5, 2005, unindicted co-conspirator C.W., in Houston, Texas, caused a wire transfer of $18,973 from an account in the name of GPOA at Bank of America, in Miami, Florida, to an account in the name of UAC at Bancentro in Managua, Nicaragua.

18.     On or about January 3, 2006, defendant BONCAMPER signed a "Code Word Agreement" and other documents necessary for Brentwood to open an account at Hypo Alpe-Adria-

Bank (Lichtenstein) AG in Liechtenstein.

In violation of Title 18, United States Code, Section 1956(h).

**A TRUE BILL:**

ORIGINAL SIGNATURE ON FILE

FOREPERSON OF THE GRAND JURY

José Angel Moreno
United States Attorney

By:_____
JOHN R. LEWIS
Assistant United States Attorney

19