UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

FEB 1 6 2011

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| v. | § | CRIMINAL NO. 10-CR-814-S |
| MALCHUS IRVIN BONCAMPER, | § | |
| CHRISTOPHER PURSER, | § | |
| ROBERT STEVE MILLS, | § | 18 U.S.C. § 1349 |
| EDMUND HUGH BENTON, | § | 18 U.S.C. § 1343 |
| WILLIAM BALLACHEY and | § | 18 U.S.C. § 1956(h) |
| MARC-THIBAUD DUCHESNE, | § | 18 U.S.C. § 1512(b)(1) |
| | § | |
| Defendants. | § | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

At all times material to this Superseding Indictment:

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

A.   **INTRODUCTION**

1.     Defendant **MALCHUS IRVIN BONCAMPER,** a Chartered Certified Accountant,

was a citizen and resident of the Federation of St. Kitts and Nevis in the West Indies.  Defendant

BONCAMPER operated a business that formed "shell" companies in St. Kitts and Nevis, including

insurance companies.  Defendant BONCAMPER also prepared fraudulent financial statements for

such companies and falsely claimed to audit them.  In 1995, defendant BONCAMPER was ordered

by the Texas Department of Insurance ("TDI") to cease and desist from engaging in the business of

insurance in an unauthorized manner in the State of Texas.  In 1999, defendant BONCAMPER

applied to register a company called Commercial Acceptance Indemnity Ltd. ("Commercial") under

1

the Companies Act of 1996 in St. Kitts. Authorities denied the application because the word "Indemnity" in Commercial's name implied that it was engaged in the business of insurance when that was not the case. Thereafter, defendant BONCAMPER arranged for a company with the same name to be incorporated in nearby Nevis.

2.     Defendant **CHRISTOPHER PURSER** was a resident of Houston, Texas. Defendant PURSER controlled Monarch Insurance Services ("Monarch"), an insurance broker in Houston, Texas, that sold fake liability insurance policies to nursing homes and assisted living facilities. Thereafter, operating through property owner "benefit associations", defendant PURSER sold fake and fraudulent liability insurance policies to apartment complexes, condominium associations, bars and restaurants and, eventually, to a company that operated a tour boat called the *Ethan Allen* on Lake George, New York. After defendant PURSER lost his insurance license in Texas in 2003, defendant PURSER hid his role in the scheme by pretending to be other people.

3.     Defendant **ROBERT STEVE MILLS** was a resident of Dallas, Texas. Defendant MILLS controlled "shell" insurance companies formed by defendant BONCAMPER in St. Kitts and Nevis. Defendant MILLS worked closely with defendant PURSER to sell fake and fraudulent insurance policies through property owner benefit associations. Defendant MILLS also controlled United Assurance Corporation S.A. ("UAC"), a Nicaraguan company that purported to be an insurance broker.

4.     Defendant **EDMUND HUGH BENTON** was a resident of Arizona. Defendant BENTON was a close business associate of Matthew Schacter, a fugitive who lived in Barbados. Schacter went by the names Matthew Rollins, Jeremy Crane and Robert Lewis Brown ("Brown/Schacter"). Assisted by defendant BENTON and others, Brown/Schacter controlled dozens

2

of fake Caribbean insurance companies plus an entity in St. Vincent and the Grenadines called Tri-Continental Exchange Ltd.

5.      Defendant **WILLIAM BALLACHEY** was a citizen of Canada who lived in Brossard, Canada.  Defendant BALLACHEY ran Gestion D'Assurances GWB Inc. ("GWB") and 9109-4540 Quebec, Inc., which operated under the name Stonecroft Services ("Stonecroft"). Defendant BALLACHEY worked with purported insurance brokers in Jakarta, Indonesia, including Daniel Lodderhose, who lived under the name Dan Shea ("Shea/Lodderhose") and ran a business called Crusader Financial Services ("Crusader").  Defendant BALLACHEY repeatedly claimed he had the authority to issue reinsurance policies on behalf of several large Indonesian insurance companies even though that was not true.

6.      Defendant **MARC-THIBAUD DUCHESNE** was a citizen of the United Kingdon who lived in Houston, Texas.  Defendant DUCHESNE controlled Morgan West Financial Services Plc ("Morgan West"), a British company.  Defendant DUCHESNE, who sometimes used the name Dr. Carl Von Wasserman, arranged for an entity called Morganbank plc to issue fraudulent Eurobonds to St. Kitts and Nevis companies for which defendant BONCAMPER created fraudulent financial statements.  Defendant DUCHESNE claimed the Eurobonds were guaranteed by a Swiss financial institution that, in fact, did not exist.  Defendant DUCHESNE also produced financial statements and a report by fictitious "independent accountants".

**Monarch**

7.      In late 2000, defendant PURSER, through Monarch, began selling liability insurance policies to nursing homes and assisted living facilities.  The insurance policies were supposedly underwritten by Maryland Casualty Company ("Maryland Casualty"), a subsidiary of Swiss-based Zurich Insurance Company.  In fact, the policies were not real.

8.      Starting in 2001, defendant PURSER, through Monarch, began selling insurance policies supposedly underwritten by Westchester Surplus Lines, Inc. ("Westchester"). Defendant BALLACHEY claimed he arranged with broker Shea/Lodderhose for PT ING Insurance Indonesia ("ING"), an Indonesian insurance company, to reinsure the Westchester policies. Defendant BALLACHEY presented documents signed by ING official Mochammad Fauzi ("Fauzi"). However, the insurance and reinsurance was fake. Westchester sued Monarch on August 6, 2001, alleging that Westchester had no arrangement with ING and did not even insure nursing homes. Similarly, ING informed defendants PURSER and BALLACHEY on August 15, 2001, that ING was not involved with Monarch and did not insure nursing homes either. Fauzi confessed to ING officials that he was bribed to sign the documents.

9.      Later in 2001, defendant BALLACHEY supposedly arranged for PT Asuransi Allianz Utama Indonesia ("Allianz"), another Indonesian insurance company, to reinsure Monarch's policies. Defendant BALLACHEY produced letters that appeared to bear the signature of Allianz employee Arfandi Arief ("Arief"). In fact, Allianz never authorized anyone to insure or reinsure Monarch customers. Allianz informed defendant PURSER's lawyer on September 6, 2001, that Arief's signature had been forged and Allianz was not doing any business in the United States.

10.     TDI began investigating defendant PURSER in the fall of 2001. TDI formally alleged in 2002 that defendant PURSER committed fraud by selling fake insurance policies.

**IPOA**

11.     Beginning in late 2002, defendants PURSER and MILLS sold liability insurance policies to apartment complexes and condominium associations through a "benefit association" called International Property Owners Association Ltd. ("IPOA"). IPOA had been created recently in Belize. The insurance was supposedly issued by Great Domestic Insurance Company of the

4

Philippines ("Great Domestic") or Commonwealth Insurance Company of Canada ("Commonwealth"). Defendant BALLACHEY purported to arrange for yet another Indonesian insurance company, PT Asuransi Mitsui Sumitomo Indonesia ("Mitsui"), to reinsure Great Domestic. Defendant BALLACHEY presented documents signed by Mitsui official Erwan Suryadi ("Suryadi"). Defendant MILLS collected premiums from the sale of the IPOA policies in accounts at a bank in Managua, Nicaragua, and wire transferred portions of those premiums to defendants PURSER and BALLACHEY and others. In fact, neither Great Domestic nor Commonwealth ever authorized IPOA to issue the insurance policies and Mitsui did not reinsure any such policies. Suryadi confessed to Mitsui executives that he signed documents for Stonecroft without authority and without reading them, at the request of a foreigner named "Richard".

12.     On April 24, 2003, TDI applied for a cease and desist order against IPOA, UAC, defendant PURSER and another broker. TDI alleged in its application that Great Domestic, Commonwealth and Mitsui each denied participating in IPOA's program. The same day (April 24, 2003), TDI revoked defendant PURSER's and Monarch's insurance licenses. TDI announced that defendant PURSER had engaged in dishonest and fraudulent acts by selling insurance policies purportedly underwritten by Westchester when defendant PURSER had never communicated directly with Westchester and, in fact, Westchester had not issued the policies.

13.     On April 30, 2003, TDI issued a cease and desist order prohibiting IPOA, defendant PURSER, UAC and another broker from "[t]he making of or proposing to make an insurance contract from [Texas] or in Texas to any person or business or any entity without having first obtained written authority from an insurer ... and thereafter submitting it to the Texas Department of Insurance for verification". The order also prohibited IPOA, defendant PURSER, UAC and the broker from "receiving or collecting any premium, commission, membership fees, assessments, dues

or other consideration from residents ... of this state for any insurance ..."

14.     The TDI revocation and cease and desist orders were publicized in a May 2, 2003, press release which stated:

> IPOA used a Web site and agents to seek customers.  One such agent was Purser, who represented himself as an officer of IPOA.  Purser's agent licenses were revoked in April for "fraudulent and dishonest acts and practices" involving the sale of non-existent liability insurance to nursing homes.  The state also has a court judgment against Purser for $1.9 million in unpaid insurance premium taxes, penalties and interest.

> ... IPOA claimed that its insurance plan was backed by coverage from several legitimate insurers.  TDI investigators said in their application for the cease and desist order that each of those insurance companies denied that it provided insurance coverage for the IPOA plan.

## GPOA

15.     Defendants PURSER and MILLS promptly violated TDI's April 30, 2003, cease and desist order.  In June, 2003, defendant MILLS created a new benefit association in Florida called Global Property Owners Association, Inc. ("GPOA") that was largely identical to IPOA.  Over the next several years, operating from within the State of Texas, defendants PURSER and MILLS sold liability insurance policies through GPOA to apartment complexes, condominium associations, bars, restaurants and other businesses in Texas and throughout the United States.  Without submitting documents to TDI for verification, defendants PURSER and MILLS arranged for a series of fraudulent insurance companies to provide the insurance.  Defendants PURSER and MILLS also deposited insurance premiums paid by GPOA members, including residents of Texas, into accounts at Bank of America in Florida, and also directed that premium payments be sent to a UAC account at Banco De Credito Centroamericano ("Bancentro"), in Managua, Nicaragua.

16.     In or around May and June, 2003, defendants MILLS and BENTON obtained insurance for GPOA from Heritage Mutual Surety Limited ("Heritage"), a Nevis company controlled by Brown/Schacter, and defendant BALLACHEY acquired more documents signed by Mitsui

official Suryadi to make it appear Mitsui had agreed to reinsure Heritage. In fact, Heritage was a fraudulent company with no ability to pay insurance claims and Mitsui never reinsured any Heritage policy.

17. In or about July, 2003, defendant MILLS purchased a new Nevis company from defendant BONCAMPER called United Re-insurance Group Ltd. ("United"). United was established "[t]o undertake and carry on the business of all types and varieties whatsoever of insurance ...", among other purposes. However, United was never licensed to sell insurance anywhere and never had the ability to pay substantial claims.

18. In or about July, 2003, defendant DUCHESNE arranged for a recently-formed entity called Morganbank plc to issue $10,139,600 of Eurobonds to a Nevis company called Polaris International Ltd. ("Polaris"), then owned by Charles Walker ("Walker") of Mississippi. At the request of defendant DUCHESNE, defendant BONCAMPER created financial statements for Polaris and also an "auditor's report". The auditor's report stated that defendant BONCAMPER audited the financial statements "in accordance with International Standards of Auditing". In fact, defendant BONCAMPER did not conduct such an audit and Polaris' only significant asset, the Eurobonds, was worthless.

19. In or about September, 2003, defendant DUCHESNE obtained new financial statements for Polaris dated August 31, 2003. These financial statements showed Polaris had 174,080,300 Euros of assets and was owned by Group Suisse Alliance AG, a company with "EURO 4 billion under management". The financial statements included a "Report of Independent Accountants" signed by Dr. Carl Von Wasserman as President of the Audit Committee of the Insurance and Banking Divisions of a Swiss company called Bankhaus Schweizer Bundnisses AG. In fact, the financial statements were completely fake and neither Group Suisse Alliance AG nor

Bankhaus Schweizer Bundnisses AG even existed.

20.     In or about September, 2003, Walker gave defendants PURSER and MILLS authority to issue insurance policies on behalf of Polaris. Defendants PURSER and MILLS, through GPOA, began selling liability insurance policies issued by United and supposedly reinsured by Polaris. Soon thereafter, following a dispute, Walker ordered defendant MILLS to stop selling insurance policies on behalf of Polaris. On December 18, 2003, Walker sent defendant MILLS a formal "cease and desist" letter that ordered MILLS to stop making references to Polaris and stated "we are not accepting any liability as to any claims that may be incurred on past, present or future claims". (On March 29, 2004, Walker sent defendant BONCAMPER a copy of his letter to defendant MILLS.) Defendant MILLS, in turn, obtained (and sent to defendant PURSER) a letter dated February 25, 2004, in which an attorney opined that Polaris, i.e., Walker, had possibly committed criminal acts against MILLS and UAC.

21.     In or about November, 2003, defendants BONCAMPER and DUCHESNE arranged for more fraudulent Morganbank plc Eurobonds to be issued to Commercial and to a company that did not yet exist called Brentwood Re Ltd. ("Brentwood"). The bonds were purportedly guaranteed by Bankhaus Suisse Alliance AG, described in accompanying financial statements as a private financial institution established under the laws of Switzerland pursuant to a 1980 agreement and headquartered in Zug, Switzerland. In fact, Bankhaus Suisse Alliance AG was another fake Swiss entity. Defendant DUSCHESNE described the bond issue as "balance sheet re-engineering". Defendant BONCAMPER then created financial statements and auditor's reports for Commercial and Brentwood. The reports stated that defendant BONCAMPER audited the financial statements "in accordance with International Standards of Auditing". In fact, defendant BONCAMPER did not conduct such an audit and the only significant assets listed on the statements, i.e., the Eurobonds,

were worthless.

22.     On or about December 15, 2003, defendant BONCAMPER wrote a letter about the Polaris financial statements that had been "audited" by the fake Swiss accountants. Defendant BONCAMPER stated "I have performed a proper inquiry which includes both personal interviews and the review of relevant documents. This was done in accordance with generally accepted auditing standards for audit purposes." The letter concluded: "We have formed the opinion that you may rely on the financial information as presented in the referred here to audit."

### The *Ethan Allen*

23.     In or about May, 2004, defendant PURSER, through GPOA, sold liability insurance to Shoreline Cruises, Inc., which operated tour boats on Lake George, New York. The insurance, supposedly provided by United, included Marine Liability coverage for a 40-foot Dyer excursion boat called the *Ethan Allen* that Shoreline Cruises, Inc., used to take tourists sightseeing on the lake.

24.     In or about June, 2004, defendant MILLS sold GPOA to defendant PURSER.

25.     On or about July 27, 2004, defendant BONCAMPER wrote and signed a letter drafted by defendant MILLS. The letter, addressed to defendant MILLS at Commercial, claimed that United was reinsured by Commercial and Brentwood, which together had more than $50 million of assets, and that United was also reinsured by Polaris.

26.     In or about October, 2004, an employee of GPOA faxed the following documents from GPOA, in Houston, Texas, to Shoreline Cruises, Inc., in Lake George, New York: defendant BONCAMPER's July 27, 2004, letter; the fake Swiss-audited August 31, 2003, Polaris financial statement; defendant BONCAMPER's November 6, 2003, "auditor's report" and fraudulent financial statements for Commercial; and defendant BONCAMPER's December 6, 2003, "auditor's report" and fraudulent financial statements for Brentwood.

27.     In or about May, 2005, defendant PURSER, through GPOA, renewed Shoreline Cruises, Inc.'s Marine Liability insurance policy through November 1, 2005.

28.     In or about June, 2005, defendant PURSER began selling insurance policies, through GPOA, that were supposedly issued by Builders & Contractors Assurance Company, Ltd. ("Builders") of Grand Bahamas Island and Mt. Olive, New Jersey.  Like Heritage, United, Polaris, Commercial and Brentwood before it, Builders was not licensed to sell insurance, had no significant assets and no ability to pay large insurance claims.

29.     On October 2, 2005, the *Ethan Allen* capsized and sank on Lake George in New York, killing twenty elderly tourists.  The tragic accident gave rise to substantial claims against the liability insurance policy that GPOA had issued to Shoreline Cruises, Inc.

30.     From in or about November, 2005, through in or about January, 2006, defendant PURSER created and backdated letters and other documents to make it appear that Shoreline Cruises, Inc., had not purchased insurance coverage for the *Ethan Allen* while the boat was operating on Lake George, when in fact Shoreline had purchased exactly that type coverage.

31.     In or about January, 2006, defendant MILLS was presented with claims against United arising from the *Ethan Allen* tragedy.  United did not pay the claims, and lacked the financial ability to pay them.  Likewise, Polaris, Commercial, Brentwood and Builders did not, and could not, pay the claims either.

**B.     THE CONSPIRACY**

32.     From in or about 1999 through present, in the Southern District of Texas and elsewhere, the defendants,

**MALCHUS IRVIN BONCAMPER,**
**CHRISTOPHER PURSER,**
**ROBERT STEVE MILLS,**
**EDMUND HUGH BENTON,**

10

**WILLIAM BALLACHEY and**
**MARC-THIBAUD DUCHESNE,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine,

conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit an

offense against the United States, that is: to devise and intend to devise a scheme and artifice to

defraud, and to obtain money and property by means of materially false and fraudulent pretenses,

representations and promises, knowing that they were false and fraudulent when made, and

transmitting and causing to be transmitted certain wire communications in interstate and foreign

commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code,

Section 1343.

**C.    PURPOSE OF THE CONSPIRACY**

33.    It was a purpose of the conspiracy that the defendants and co-conspirators would

enrich themselves with money from the sale of fraudulent insurance policies.

**D.    MANNER AND MEANS OF THE CONSPIRACY**

34.    In order to accomplish the purpose of the conspiracy, the defendants and co-

conspirators:

a.    ignored and evaded insurance rules and regulations designed to protect consumers;

b.    engaged in the business of insurance in the State of Texas without authorization after

being ordered not to do so by the TDI;

c.    issued fake policies in the name of real insurance companies that had not authorized

the policies;

d.    created shell companies with few or no assets in places such as Belize, Nicaragua,

St. Kitts, Nevis, St. Vincent and The Bahamas for the purpose of offering insurance and re-insurance

for customers in the United States;

11

e.      created financial statements in order to mislead purchasers of insurance about the financial strength and resources of the foreign insurance companies;

f.      falsely claimed to have audited financial statements of the foreign insurance companies "in accordance with International Standards of Auditing";

g.      expressed the opinion that such financial statements "present fairly, in all material aspects, the financial position of the company" when, in fact, the financial statements were highly misleading;

h.      falsely claimed to have conducted "a proper inquiry" into a financial statement supposedly audited by Swiss accountants who were, in fact, fictitious;

i.      expressed the opinion that information presented in the fake Swiss financial statements was reliable when, in fact, the information was fake;

j.      sold insurance policies issued by the foreign insurance companies to businesses located in Texas and throughout the United States;

k.      received premium money from the sale of fake and fraudulent insurance policies; and

l.      failed to pay legitimate claims on insurance policies.

E.      **OVERT ACTS**

35.      In furtherance of the conspiracy and to achieve the purpose thereof, the defendant and his co-conspirators, in the Southern District of Texas and elsewhere, committed and caused to be committed at least one of the following overt acts, among others:

1999

1.      On or about September 3, 1999, defendant BONCAMPER arranged for Commercial to be incorporated in Nevis.

2000

12

2.      On or about December 22, 2000, defendant PURSER, through Monarch, sold a liability insurance policy to Century Care of America, Inc. ("CCA") covering ten nursing homes in Texas, which defendant PURSER claimed was underwritten by Maryland Casualty.

3.      On or about December 28, 2000, defendant PURSER prepared an invoice to CCA's premium lender for $455,423.

<u>2001</u>

4.      On or about May 11, 2001, Shea/Lodderhose sent an email to defendant BALLACHEY stating that "Effective May 10th Crusader has an authority for ING Insurance ... "

5.      On or about May 31, 2001, defendant BALLACHEY sent defendant PURSER a fax asserting that Monarch was authorized to sign policies and accept premiums using ING as the insurer.

6.      On or about June 29, 2001, defendant PURSER, through Monarch and another broker, sold a liability insurance policy to Alterra Healthcare Corporation ("Alterra") which which defendant PURSER claimed was underwritten by Westchester and reinsured by ING.

7.      On or about July 3, 2001, defendant PURSER, through Monarch and another broker, sold a liability insurance policy to American Retirement Corp. ("ARC") which which defendant PURSER claimed was underwritten by Westchester.

8.      On or about July 31, 2001, defendant BALLACHEY sent defendant PURSER a fax in which defendant BALLACHEY claimed Monarch was authorized to sign insurance policies and accept premiums using "Allianz" as the insurer.

9.      On or about August 16, 2001, defendant BALLACHEY sent a letter to defendant PURSER's lawyer that was signed by an ING official and purported to confirm ING insured nursing homes for GWB.

10.     On or about August 16, 2001, defendant BALLACHEY sent a letter to defendant PURSER's lawyer that stated "I have been informed by my intermediary that the coverage for [Alterra and ARC] have been replaced by Allianz".

11.     On or about October 17, 2001, defendant PURSER caused Monarch to file a lawsuit in Montreal, Canada, against defendant BALLACHEY, GWB, Bougie and Global Protection.  The lawsuit accused Bougie and Ballachey of having perpetrated "a sophisticated fraudulent scheme".

12.     On or about October 30, 2001, defendant MILLS changed the name of a Nicaraguan company he owned to UAC.

2002

13.     On or about September 9, 2002, defendant DUCHESNE caused Morgan West to be incorporated in the United Kingdom, and defendant DUCHESNE became its director.

14.     On or about September 13, 2002, defendant PURSER caused IPOA to be incorporated in Belize.

15.     On or about November 12, 2002, defendant BONCAMPER purchased Polaris in St. Kitts.

16.     On or about December 16, 2002, defendants MILLS and PURSER entered into a "Letter of Agreement" with defendant BALLACHEY.  Defendant MILLS signed for UAC, defendant PURSER signed for IPOA (erroneously described as Independent Organization Property Association) and defendant BALLACHEY signed for Stonecroft.

2003

17.     On or about January 23, 2003, defendant BALLACHEY acquired documents signed by an official of Mitsui named Erwan Suryadi ("Suryadi"), including a "placement slip" dated January 23, 2003, bearing a Mitsui stamp.

18.     On or about January 28, 2003, defendant PURSER emailed a copy of the Mitsui "placement slip" to defendant MILLS.

19.     On or about February 25, 2003, defendant BONCAMPER arranged for Polaris to be "re-domiciled" in Nevis.

20.     On or about March 19, 2003, defendant PURSER wrote a letter addressed to Great Domestic.

21.     On or about March 21, 2003, defendant BALLACHEY wrote a letter addressed to "Whom It May Concern".  The letter listed thirty-nine apartments and condominiums purportedly covered by Mitsui's reinsurance as of March 1, 2003.

22.     On or about March 28, 2003, defendant PURSER wrote a letter addressed to the "Executive Director" of IPOA.  The letter stated that "Great Domestic is the chosen issuing Insurance Company.  Great Domestic ... is only a front company ... They have agreed to take no risk ... P.T. Asuransi Mitsui Marine Indonesia (wholly owned subsidiary of Mitsui Sumitomo) is the reinsurer ..."

23.     In or about March, 2003, defendant MILLS purchased a company in Nicaragua and changed its name to"Asociación Global de Propietarios S.A./GPOA".

24.     On or about April 29, 2003, defendant MILLS caused a meeting to take place in Managua, Nicaragua, for the purpose of creating a Nicaraguan company called Asociación Internacional de Propietarios, Sociedad Anónima (which is the Spanish translation of IPOA).

25.     On or about May 6, 2003, defendant BALLACHEY sent a fax to defendants PURSER and MILLS with additional documents bearing Suryadi's signature and initials.  One document, dated April 15, 2003, listed fifty apartment complexes and condominiums in Texas that were purportedly reinsured by Mitsui. Defendant BALLACHEY stated in the fax cover sheet that "Mitsui

will update the list every month if required as new risks are submitted and where payments have been received by them."

26.    On or about May 5, 2003, defendant PURSER caused an employee to send an email to defendant BENTON with sample documents from IPOA's insurance program.

27.    On or about May 12, 2003, defendant BALLACHEY sent a letter to defendant MILLS complaining that the manager of an apartment that bought insurance through IPOA had contacted Mitsui directly.  Defendant BALLACHEY wrote: "Now we are strongly requesting that this affair be put in order and a 'muzzle' be put on unsolicited faxes or calls to R/I, which greatly disturbs them.  If you want this program jeapordized, just keep on letting the likes of Brenda Garner Gillaspie run amok. ..." Defendant BALLACHEY also said he would ask Mitsui to "change the cedent", i.e., switch Mitsui's reinsurance to cover Heritage instead of Great Domestic, "only when all R/I payment due are up to date".

28.    On or about May 21, 2003, defendant BALLACHEY sent a fax to defendant MILLS in which BALLACHEY claimed, once again, that he had authority to bind Mitsui to insurance policies.  Defendant BALLACHEY's fax included a draft of an agreement dated May 7, 2003, between himself, IPOA and Heritage.  Defendant BALLACHEY signed the agreement above the words "Authorized representative of Stonecroft Services On behalf of PT Asuransi Mitsui Marine Indonesia".  On the fax cover sheet, defendant BALLACHEY wrote: "Steve, Much pressure was put on me to sign this form immediately and forward it to you.  So now it's done.  The ball is now in your court to get those installments up-to-date."

29.    On or about May 22, 2003, defendant BENTON emailed two versions of the May 7, 2003, IPOA-Heritage agreement to Valerie DeFreitas ("DeFreitas"), Heritage's office manager in Kingstown, St. Vincent,  and told her to sign them and fax them back to him in Arizona.

30.     On or about May 27, 2003, defendant BENTON emailed a computer-generated facsimile of DeFreitas' signature to defendant PURSER's office, thereby giving him the ability to place DeFreitas' signature on insurance documents provided to GPOA members.

31.     On or about May 28, 2003, defendant BENTON emailed a spreadsheet to DeFreitas and Brown/Schacter listing "the existing property risks in Texas reinsured to Mitsui Indonesia." Defendant BENTON informed DeFreitas that "this slip was a replacement of a Philippine front with Heritage" and that "some insurance brokers are concerned as regards coverage. when they call, they will have been working with Chris Purser in Houston and may want a verbal confirmation that Heritage is the new front carrier." Defendant BENTON explained to DeFreitas how she could find information in the spreadsheet that she would need in order to give that confirmation.

32.     On or about May 29, 2003, defendant BENTON emailed another version of the May 7, 2003, IPOA-Heritage agreement to DeFreitas and Brown/Schacter, and asked DeFreitas to sign it and fax it to him (defendant BENTON) in Arizona.  The agreement was identical to the one defendant BALLACHEY signed on May 21, 2003, except it substituted GPOA for IPOA. Defendant BENTON explained "This is necessary to completely separate the program from the old front. Mitsui via Stonecroft has agreed and will sign."

33.     In or about late May or early June, 2003, defendant PURSER caused employees to send an unsigned letter to IPOA's members.  The letter, dated May 7, 2003, made no mention of TDI's recent cease and desist order against IPOA or the revocation of defendant PURSER's Texas insurance license. Instead, the letter announced that Great Domestic had refused to honor obligations "due to contractual disagreements" and that, as a result, IPOA was terminating its "management of the program".  However, the letter stated, IPOA had "secured a replacement 'front'", i.e., Heritage, and Heritage had been "approved" by Mitsui. The letter explained that a "replacement Association",

i.e., GPOA, had secured the same coverage from Heritage and Mitsui and would absorb IPOA's members. The letter stated that GPOA's "domestic address" was 10400 NW 33rd, Suite 270, in Miami, Florida, which in fact was a virtual office operated by a company called Officescape. The letter instructed IPOA members who wanted continued insurance coverage to fax a request to Heritage in St. Vincent. Finally, the letter enclosed a declarations sheet bearing the electronic signature of DeFreitas.

34.     On or about June 10, 2003, defendant MILLS incorporated GPOA in Florida.

35.     On or about June 19, 2003, defendant BENTON emailed to Brown/Schacter and DeFreitas copies of documents dated May 18, 2003, signed by Mitsui's Suryadi. The documents indicated that Mitsui was reinsuring Heritage and listed seventy-eight apartment complexes and condominiums in the Houston, Texas, area covered by the insurance.

36.     On or about July 3, 2003, defendant BONCAMPER arranged for United to be incorporated in Nevis, and then sold United to defendant MILLS.

37.     On or about July 10, 2003, defendant DUCHESNE sent an email asking defendant BONCAMPER to create audited financial statements for Polaris.

38.     On or about July 23, 2003, defendant DUCHESNE sent an email informing defendant BONCAMPER that he (DUCHESNE) had sent BONCAMPER the original Polaris Eurobonds issued by Morganbank plc.

39.     On or about August 15, 2003, at the request of defendant DUCHESNE, defendant BONCAMPER created financial statements and an "auditor's report" for Polaris. The only significant assets listed on the financial statements were defendant DUCHESNE's fraudulent Morganbank plc Eurobonds.

40.     On or about August 23, 2003, defendant BENTON proposed in an email to

defendants MILLS and PURSER that GPOA members send premium payments directly to Tri-Continental.  Defendant BENTON proposed that Heritage assume fifty or one hundred percent of the insurance risk.

41.     On or about August 28, 2003, defendant BENTON emailed two documents to DeFreitas: a memorandum of understanding ("MOU") between Heritage and GPOA and a "Quota Share Reinsurance Agreement" between Heritage and United.  The MOU, which bore the signatures of defendant MILLS and R.K., provided that Heritage would insure GPOA's members, collect premiums, manage claims and administer the program through Tri-Continental.  The MOU also provided that Heritage would obtain reinsurance.  The reinsurance agreement, which also bore the signature of defendant MILLS, provided that United would reinsure fifty percent of Heritage's liability to GPOA members.

42.     On or about September 15, 2003, defendant MILLS emailed to defendant PURSER a letter that was addressed to GPOA's members.  The letter announced that GPOA had secured insurance coverage from United and reinsurance from Polaris.

43.     On or about September 19, 2003, defendant PURSER, through GPOA and an insurance broker in Houston, Texas, offered to sell liability insurance to a restaurant and bar on Lake George, New York, called Shoreline Restaurant, Inc., and King Neptune, Inc.  The insurance was to be provided by Polaris.

44.     On or about September 23, 2003, defendant PURSER sent an email that stated "We have the exclusive pen for this company", referring to Polaris.

45.     On October 2, 2003, DeFreitas sent defendant BENTON an email stating "Please advise how I should deal with the telephone call and faxes on Heritage", to which defendant BENTON responded "My understanding is that the GPOA changed the carrier and that Heritage is

not the insurer.  Future callers should be referred to the GPOA representative ...”

46.     On or about October 3, 2003, an insurance broker in Houston, Texas, faxed part of defendant DUCHESNE’s fake August 31, 2003, Polaris financial statement to the owner of Shoreline Restaurant, Inc., and King Neptune, Inc., in Lake George, New York.

47.     On or about October 9, 2003, defendant BENTON received a power of attorney authorizing him to issue bonds on behalf of Polaris.

48.     On or about November 6, 2003, defendant BONCAMPER created financial statements and an “auditor’s report” for Commercial.  The only significant assets listed on the financial statements were defendant DUCHESNE’s fraudulent Morganbank plc Eurobonds.

49.     On or about November 7, 2003, defendant DUCHESNE sent an email to defendant BONCAMPER regarding the fraudulent Eurobonds Morganbank plc issued to Commercial. Defendant DUCHESNE instructed defendant BONCAMPER to tell a potential purchaser of Commercial that “I have conducted sufficient due diligence to satisfy audit of the authenticity, legality and authority of the issuer, guarantor and bonds”.

50.     On or about November 7, 2003, an unknown co-conspirator faxed a “Quota Share Reinsurance Agreement” to GPOA.  The document, dated August 25, 2003, purported to be an agreement between Polaris and United.  Defendant MILLS signed for Polaris and an unknown co-conspirator forged the signature of defendant MILLS’ daughter, F.D., on behalf of United.

51.     On or about November 9, 2003, defendant DUCHESNE sent an email to a potential purchaser of Commercial that described the Morganbank plc Eurobonds as “balance sheet re-engineering”.

52.     On or about November 10, 2003, defendant BONCAMPER sent an email to a potential purchaser of Commercial describing how the Morganbank plc Eurobonds were guaranteed

by Bankhaus Suisse Alliance AG which, as stated above, was a fake company.

53.     On or about November 24, 2003, defendant BONCAMPER arranged for Brentwood to be incorporated in St. Kitts.

54.     On or about December 6, 2003, defendant BONCAMPER created financial statements and an "auditor's report" for Brentwood.  The only significant assets listed on the financial statements were defendant DUCHESNE's fraudulent Morganbank plc Eurobonds.

55.     On or about December 15, 2003, defendant BONCAMPER wrote a letter about the August 31, 2003, Polaris financial statements that had been "audited" by fake Swiss accountants (Bankhaus Schweizer Bundnisses AG).  Defendant BONCAMPER stated in the letter: "We have formed the opinion that you may rely on the financial information as presented in the referred here to audit."

56.     On or about December 18, 2003, Walker wrote a letter ordering defendant MILLS not to make any reference to Polaris and informing MILLS that Polaris was "not accepting any liability as to any claims that may be incurred on past, present or future claims".

57.     On or about December 23, 2003, GPOA emailed a proposal for United to provide liability insurance to the owner of King Neptune, Inc., in Lake George, New York.  King Neptune, Inc., accepted the proposal and purchased an insurance policy written by United.

2004

58.     On or about February 9, 2004, an unknown co-conspirator wrote a letter on United stationary with an London, England, address (#29 Harley Street) which in fact was a virtual office. The letter, addressed to GPOA in Toronto, Canada, bore the forged signature of defendant MILLS' daughter, F.D., identified as "Claims Manager".

59.     On or about March 10, 2004, an unindicted co-conspirator, K.G., sent an email to

defendant PURSER asking "Mr. Jesse Mills, Mr. Steve Mills, Mr. Chuck Wegman, Mr. Mike Sparks?  Who should I call you today?".  Defendant PURSER responded: "this message will be forwarded to mr. mills for him to read, i believe your tiem with us may be over, i have no idea what you are stating." K.G. replied: "Are you kidding me?  Are you actually denying that you use those names on a daily basis?  Why then, oh why, have you repeatedly instructed my not to use your name, or the Houston number in any of the business dealings?  You have used those names on numerous occasions and I can't believe you are trying to lie about it ..."

60.     On or about March 28, 2004, defendant DUCHESNE caused Morgan West to send defendant BONCAMPER an email about the fraudulent Eurobonds issued to Polaris.  The email stated in part:

> ...The bonds were "placed in trust" with you as per your email accepting this position. However, given that Polaris NEVER paid any further monies for the bonds to which they agreed we as FISCAL AGENT executed on the Euro register a default and struck from said register said bonds, including the issue series and certificate numbers. The entry on the register is "not returned, lost or stolen". The Certificates have no value and use of these in any form or manner would subject the person and or Corporation to criminal prosecution.

61.     On or about March 29, 2004, defendant BONCAMPER received copies of the December 18, 2003, letter from Walker to defendant MILLS, and also a letter dated March 18, 2004, from Walker to defendant DUCHESNE.  The March 18, 2004, letter stated in part:

> We have patiently waited for you to fulfill your agreement to facilitate an additional Thirty Million Dollars ($30,000,000.00 US) into Euro Bonds or equivalent assets to replace the non-auditable Suisse Alliance Statement. ... As a result of this agreement with you, we terminated our arrangements with Steve Mills and his company. ...

62.     On or about May 13, 2004, defendant PURSER caused an employee to fax a proposal for United to provide liability insurance to Shoreline Cruises, Inc., which operated tour boats on Lake George, New York.

63.     On or about May 21, 2004, defendant PURSER caused an employee to email a

22

revised proposal to Shoreline Cruises, Inc., for United to provide liability insurance for the company's boats. The proposal included Marine Liability coverage for a 40-foot Dyer excursion boat called the *Ethan Allen* that Shoreline Cruises, Inc., used to take tourists sightseeing on Lake George.

64.    On or about June 15, 2004, defendants MILLS and PURSER signed a contract providing that Opus International USA, Inc., a company defendant PURSER controlled, would purchase GPOA from Asociación Global de Propietarios, S.A., a Nicaraguan company defendant MILLS controlled.

65.    On or about July 1, 2004, defendant BONCAMPER gave defendant MILLS powers of attorney that gave him control of Commercial and Brentwood.

66.    On or about July 20, 2004, defendant PURSER stated the following in an email to defendant MILLS: "... i am sorry to have blown up. i dont' mean it. please accept my apology and lets move on. we are on the move up. please don't get rid of me, i am sorry." Defendant MILLS replied, in part:

> I like you personally. I just do not want to do business, you can forward the bordereaux to UAC for the business as you said you would do last Friday, which has left me once again looking like a liar and an idiot! United Re will remain on the risk until you can find another carrier, if you can not find one, I believe Harvey has a friend that can help you with it. I would like to be OFF the risk ASAP, I will not leave you in the lurch hanging, but please make every effort to get this done ASAP, and no later than the end of third quarter. ...

67.    On or about July 26, 2004, defendant MILLS drafted a letter to be written by defendant BONCAMPER and emailed the draft to defendants PURSER and BONCAMPER.

68.    On or about July 27, 2004, defendant BONCAMPER wrote the letter defendant MILLS had drafted with only a few changes. The letter, addressed to defendant MILLS at Commercial, said the following:

> "... It has been duly noted that your agencies may need some additional assurances that there

are adequate arrangements in place to cover the risks assumed by the Company, and therefore it can be acknowledge that there does indeed exists a reciprocal quota share arrangement between Commercial Acceptance Indemnity Ltd. and Brentwood Re Limited, which provide a combined statement in excess of $50 million USD.  The excess slip in place with United Reinsurance Group Limited commencing August 1, 2004, has been reviewed by this firm and appears to be in order, not being an Insurance underwriter I am not sure how the additional treaty between United Re and Polaris International relate to your associates query, and can thus only comment that one does exist. ..."

69.     On or about August 20, 2004, defendant MILLS sent an email to defendants PURSER and BONCAMPER stating in part: "... the wire did not arrive [at Bancentro] for the balance of the July reinsurance premiums, thus no wire went to Mr. Boncamper! ... [Y]ou are expected to have a home else where for domestic business at the end of September."

70.     In or about October, 2004, defendant PURSER caused an employee to fax the following documents from GPOA, in Houston, Texas, to Shoreline Cruises, Inc., in Lake George, New York: defendant BONCAMPER's July 27, 2004, letter; the fake Swiss-audited August 31, 2003, Polaris financial statement; defendant BONCAMPER's November 6, 2003, "auditor's report" and fraudulent financial statements for Commercial; and defendant BONCAMPER's December 6, 2003, "auditor's report" and fraudulent financial statements for Brentwood.

2005

71.     On or about January 7, 2005, defendant MILLS told defendant PURSER in an email that "Irvin still covers for me".

72.     On or about March 14, 2005, defendant BONCAMPER arranged for Brentwood to be "re-domiciled" in Nevis.

73.     On or about April 26, 2005, defendant PURSER caused an employee to fax to Shoreline Cruises, Inc., a proposal to renew its insurance policy for the company's boats, including the *Ethan Allen*.

74.     On or about June 6, 2005, defendant MILLS sent an email to defendant PURSER

stating "You really have put me in a bad position with this domestic shit.  I need a letter of cancellation to go out to ALL insureds as of March, and a confirmation from you that details any and all pending claims and litigation. ..."

75.     On or about June 15, 2005, defendant MILLS sent an email to defendant PURSER and others stating "This is to confirm, and clear up any misunderstandings.  Chris, does in fact have the authority to bind on Commercial Acceptance, due to the changes in our corporate structure the authority to bind for the other companies has been rescinded. ... Any funds due the company should be sent to our admin in Managua at UAC, the web detail is UACSA.com."

76.     On or about August 29, 2005, an unindicted co-conspirator, M.K., caused an employee to email a letter to defendant PURSER describing insurance GPOA purportedly obtained from a company in The Bahamas (Builders & Contractors Assurance Company, Ltd.).

77.     On or about September 12, 2005, defendant MILLS sent an email to a lawyer, with a copy to defendants PURSER and BONCAMPER and others, that stated: "No, John I do NOT have any evidence of coverage 'Takeover' from Chris, GPOA, International Underwriters or anyone else.  Coverage terminated as of 3-31-2005, and the only thing you can do is state that in your response."

78.     On or about September 28, 2005, an unknown co-conspirator incorporated a new company in Florida called "Global POA, Inc."  Defendant MILLS was listed as the registered agent and one of the directors.

79.     On or about November 4, 2005, defendant PURSER caused an employee to send an email to Shoreline Cruises, Inc., announcing that its insurance policy had expired.  A document attached to the email stated that the expired policy had been issued by Builders (as opposed to United).

2006

80.     On or about January 6, 2006, an unknown co-conspirator incorporated a new company in Florida called "Global Property Owners Ass., Inc." Defendant MILLS was listed as the registered agent and defendant PURSER was listed as one of the directors.

81.     On or about January 11, 2006, defendant PURSER created a letter addressed to Shoreline Cruises, Inc., that was backdated to a date (October 20, 2004) before the *Ethan Allen* accident. The letter stated in part: "The money you have already saved is nothing in comparison to having an accident with one of your boats while operating them on the lake, where they have no coverage. I strongly urge you to reconsider the quote for Marine Liability and Hull coverage on your entire fleet. I realize that you know the lake much better than we do and you have never had an accident before, but this is our recommendation to you. ..."

82.     On or about January 17, 2006, defendant MILLS sent an email to defendant PURSER and others that stated in part: "We are preparing a denial letter, however, the issue which exists which is in question is the basis on which we deny, and the fact that their second move will be a 'Bad Faith' claim, which with the tragic nature of the case would most likely be upheld, without same! (No need to remind that this if upheld is a criminal charge! ..."

83.     On or about January 17, 2006, defendant PURSER sent an email to defendant MILLS that stated in part: "I believe we have uncovered and have at the moment documentation which would suffice to allow United RE proper backup to issue a good faith denial of Shoreline Cruises, Inc. claim regarding the Ethan Allen incident. ..."

84.     On or about January 30, 2006, defendant MILLS emailed a letter to defendant BONCAMPER and others. The letter, on United stationary (using a "mail drop" address in London and defendant BONCAMPER's office address in St. Kitts), was addressed to Shoreline Cruises, Inc.'s attorney. The letter stated in part: "In fact as you state it is indeed a tragedy that took place

on Lake George, and for which we intend to employ exhaustive efforts to be 100% satisfied of the final disposition of the claim. We will not be bullied, intimidated or co-ercised into paying any claim that we do not owe, but will most certainly satisfy the claims that we do owe. ... This being said, I will advise you that, we do have in our possession a statement from Charles Wegman, that 'Marine General Liability was offered and declined in 2004' Wegman then also asserts that he specifically described the risk Shoreline was incurring by not accepting Marine."

85.     On or about January 31, 2006, defendant PURSER sent a letter from GPOA to Shoreline Cruises, Inc. The letter, which bore the forged signature of unindicted co-conspirator C.W., stated in part: "As there appears to be conflicting facts regarding the referenced claim, the company hereby requests a 'proof of claim' detailing the basis of liability in writing from the additional insured, Shoreline, pursuant to the GPOA 'Master Policy'. ... Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information may be guilty of an offense."

86.     On or about February 3, 2006, defendant BONCAMPER signed a letter certifying that United was a "duly registered reinsurance company" in good standing with the laws and registrations requirements in the Federation of St. Kitts and Nevis.

87.     On or about March 31, 2006, defendant BONCAMPER drafted a letter stating that a balance sheet for United dated December 31, 2005 (showing $270,216,365 of assets and only $4,856,095 of liabilities) "present[ed] the financial position of the company in accordance with International Accounting Standards..."

2007

88.     On or about March 26, 2007, defendant MILLS forwarded a newspaper article to defendant BONCAMPER and others that began as follows: "A cruise line and the captain of a boat

that capsized on Lake George, killing 20 elderly tourists, pleaded guilty Monday to a misdemeanor charge. Shoreline Cruises and Capt. Richard Paris pleaded guilty to not having enough crew members aboard the *Ethan Allen* tour boat when it overturned during a fall foliage cruise on Oct. 2, 2005, throwing its passengers into the cold water of the Adirondack Mountains lake. ...”

89.     On or about March 26, 2007, defendant BONCAMPER responded: “I find this story remarkable for one reason only, that is the low fine of Usd 250. How is business your way?”

90.     On or about March 26, 2007, defendant MILLS replied to defendant BONCAMPER: “It is a very suspect plea, only a misdemeanor, but it gives cause for denial. We had been plundered because of this negative press surrounding this bloody mess, now I will commence a positive PR campaign and a new audit and we should be back in business. ...”

91.     On or about March 26, 2007, defendant BONCAMPER responded: “I welcome all possible opportunities to increase my income stream ...”

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWO - TEN
(Wire Fraud)

### A.     INTRODUCTION

1.     Paragraphs 1 through 31 of Count One of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### B.     THE SCHEME TO DEFRAUD

2.     From in or about 1999 through present, in the Southern District of Texas and elsewhere, the defendants,

**MALCHUS IRVIN BONCAMPER,
CHRISTOPHER PURSER,
ROBERT STEVE MILLS,
EDMUND HUGH BENTON,
WILLIAM BALLACHEY and**

28

### MARC-THIBAUD DUCHESNE,

aided and abetted by others known and unknown to the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations and promises.

**C.**   **THE MANNER AND MEANS OF THE SCHEME**

3.   Paragraph 34 of Count One of this Superseding Indictment is re-alleged and incorporated by reference herein as a description of the scheme and artifice.

**D.**   **THE EXECUTION OF THE SCHEME**

4.   On or about the date specified below, the defendants, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as more particularly described below:

| Count | Date | Description |
|-------|------|-------------|
| 2 | May 12, 2003 | Defendant BALLACHEY, in Canada, sent an email to defendant MILLS, in the United States, regarding Mitsui and Heritage |
| 3 | May 27, 2003 | Defendant BENTON, in Arizona, emailed a computer-generated facsimile of Valerie DeFreitas' signature to defendant PURSER's office in Houston, Texas |
| 4 | July 10, 2003 | Email from defendant DUCHESNE, in Houston, Texas, to defendant BONCAMPER, in St. Kitts, describing the Polaris Eurobonds and requesting an audit |
| 5 | Nov. 7, 2003 | Email from defendant DUSCHESNE, in Houston, Texas, to defendant BONCAMPER, in St. Kitts, regarding a (fake) Bankhaus Suisse Alliance AG bond guarantee |

| 6 | July 1, 2004 | Email from defendant MILLS, in the United States, to defendant BONCAMPER, in St. Kitts, stating in part: "This thing will start in this month and we will start generating income next month :-) We will have to have a meeting somewhere man that lets us foolishly spend our first little taste:-) then we can begin saving the rest for our future :-) |
| 7 | July 2, 2004 | Email from defendant BONCAMPER, in St. Kitts, to defendant MILLS, in the United States, stating in part: "Okay, Steve, I want to go along with you but this deal have to make some money before too long.  Monthly Cash Flow is what you promised. ... This can NOT be another Polaris!! ..." |
| 8 | July 27, 2004 | Email from defendant MILLS, in the United States, to defendant BONCAMPER, in St. Kitts, requesting a letter about insurance arrangements between Commercial, Brentwood, United and Polaris |
| 9 | October, 2004 | Fax from GPOA employee, in Houston, Texas, to Shoreline Cruises, Inc., in Lake George, New York, which included the following: defendant BONCAMPER's July 27, 2004, letter; the fake Swiss-audited August 31, 2003, Polaris financial statement; defendant BONCAMPER's November 6, 2003, "auditor's report" and fraudulent financial statements for Commercial; and defendant BONCAMPER's December 6, 2003, "auditor's report" and fraudulent financial statements for Brentwood. |
| 10 | March 26, 2007 | Email from defendant BONCAMPER, in St. Kitts, to defendant MILLS, in the United States, stating in part: "I welcome all possible opportunities to increase my income stream ..." |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT ELEVEN
(Conspiracy to Launder Money)

**A.**     **INTRODUCTION**

1.     Paragraphs 1 through 31 of Count One of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

**B.**     **THE CONSPIRACY**

2.     From in or about 1999 through present, in the Southern District of Texas and elsewhere, the defendants,

**MALCHUS IRVIN BONCAMPER,**
**CHRISTOPHER PURSER,**
**ROBERT STEVE MILLS,**
**EDMUND HUGH BENTON,**
**WILLIAM BALLACHEY and**
**MARC-THIBAUD DUCHESNE,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a)     to transport, transmit, and transfer and attempt to transport, transmit, and transfer funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of Wire Fraud, a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b)     to transport, transmit, and transfer, and attempt to transport, transmit, and transfer funds involving proceeds of specified unlawful activity, that is, Wire Fraud, from a place in the United States to and through a place outside of the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

c)     to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value of greater than $10,000, such property having been

derived from Wire Fraud, a specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

## C. MANNER AND MEANS OF THE CONSPIRACY

3.      Paragraph 34 of Count One of this Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein as the manner and means of this conspiracy.

## D. OVERT ACTS

4.      In furtherance of the conspiracy and to achieve the purpose thereof, the defendants and their co-conspirators, in the Southern District of Texas and elsewhere, committed and caused to be committed at least one of the following overt acts, among others:

2001

1.      On or about July 9, 2001, defendant PURSER caused a wire transfer of $437,688 from an account in the name of Monarch at Washington Mutual Bank FA, in Houston, Texas, to an account controlled by defendant BALLACHEY in the name of GWB at Canadian Imperial Bank of Commerce in Brossard, Canada.

2.      On or about July 24, 2001, defendant PURSER caused a wire transfer of $169,280 from Monarch's account at Washington Mutual Bank FA, in Houston, Texas, to defendant BALLACHEY's GWB account at Canadian Imperial Bank of Commerce in Brossard, Canada.

3.      On or about August 7, 2001, defendant PURSER caused a wire transfer of $519,000 from Monarch's account at Washington Mutual Bank FA, in Houston, Texas, to an account controlled by Bougie in the name of Global Protection at Toronto Dominion Bank in Montreal, Canada.

4.      On or about August 9, 2001, defendant PURSER caused a wire transfer of $812,290 from Monarch's account at Washington Mutual Bank FA, in Houston, Texas, to Bougie's Global

Protection account at Toronto Dominion Bank in Montreal, Canada.

<u>2002</u>

5.      On or about November 11, 2002, defendant MILLS caused UAC to open an account at Bancentro in Managua, Nicaragua.

6.      On or about December 3, 2002, defendant PURSER caused a wire transfer of $7,501 from an account in the name of Roland M. Stewart at Bank Leumi USA, Chicago, Illinois, to an account controlled by defendant MILLS at Bancentro in Managua, Nicaragua.

7.      On or about December 3, 2002, defendant PURSER caused a wire transfer of $4,886 from the Roland M. Stewart account at Bank Leumi USA, Chicago, Illinois, to an account controlled by defendant MILLS at MetroBank N.A. in Richardson, Texas.

8.      On or about December 19, 2002, defendants PURSER and MILLS caused a wire transfer of $19,366 from the Roland M. Stewart account at Bank Leumi USA, Chicago, Illinois, to an account controlled by defendant BALLACHEY in the name of Stonecroft at Bank of Montreal in Brossard, Canada.

<u>2003</u>

9.      On or about February 21, 2003, defendant MILLS caused a wire transfer of $50,143 from an account at Bancentro in Managua, Nicaragua, to defendant BALLACHEY's Stonecroft account at Bank of Montreal in Brossard, Canada.

10.      On or about February 28, 2003, defendant MILLS caused a wire transfer of $70,000 from an account in the name of UAC at Bancentro in Managua, Nicaragua, to defendant BALLACHEY's Stonecroft account at Bank of Montreal in Brossard, Canada.

11.      On or about March 6, 2003, defendant MILLS caused a wire transfer of $12,000 from the UAC account at Bancentro in Managua, Nicaragua, to an account in the name of IPOA Team

Ocean Ltd. at HSBC, Hong Kong.

12. On or about March 6, 2003, defendant MILLS caused a wire transfer of $40,000 from an account at Bancentro in Managua, Nicaragua, to defendant BALLACHEY's Stonecroft account at Bank of Montreal in Brossard, Canada.

13. On or about March 11, 2003, defendant MILLS caused a wire transfer of $70,000 from the UAC account at Bancentro in Managua, Nicaragua, to defendant BALLACHEY's Stonecroft account at Bank of Montreal in Brossard, Canada.

14. On or about March 25, 2003, defendant MILLS caused a wire transfer of $53, 512 from the UAC account at Bancentro in Managua, Nicaragua, to defendant BALLACHEY's Stonecroft account at Bank of Montreal in Brossard, Canada.

15. On or about May 6, 2003, defendant BONCAMPER arranged for Polaris to open an account at The Bank of Nevis International Ltd. ("Bank of Nevis") in Nevis.

16. On or about July 1, 2003, defendant MILLS opened an account (number 003678549042) for GPOA at Bank of America, Florida.

17. On or about July 1, 2003, defendant MILLS caused a wire transfer of $5,000 from GPOA's account at Bank of America, Florida, to an account controlled by defendant BENTON in the name of Commercial General Capital Investments ("Commercial General") at First Caribbean International Bank ("First Caribbean") in Nassau, The Bahamas.

18. On or about July 7, 2003, defendant MILLS caused a wire transfer of $10,000 from GPOA's account at Bank of America, Florida, to defendant BENTON's Commercial General account at First Caribbean.

19. On or about July 8, 2003, defendant MILLS caused a wire transfer of $20,000 from GPOA's account at Bank of America, Florida, to defendant BALLACHEY's Stonecroft account at

Bank of Montreal in Brossard, Canada.

20.     On or about July 15, 2003, defendant MILLS caused a wire transfer of $11,000 from GPOA's account at Bank of America, Florida, to defendant BENTON's Commercial General account at First Caribbean.

21.     On or about July 16, 2003, defendant MILLS caused a wire transfer of $18,000 from GPOA's account at Bank of America, Florida, to defendant BALLACHEY's Stonecroft account at Bank of Montreal in Brossard, Canada.

22.     On or about August 15, 2003, defendants BONCAMPER and DUCHESNE opened accounts for Morgan West at St. Kitts-Nevis-Anguilla National Bank Ltd. ("SKNA National Bank") in St. Kitts.

23.     On or about September 8, 2003, defendant MILLS caused a wire transfer of $38,586 from a GPOA account at Bank of America, in Florida, to the Polaris account at The Bank of Nevis.

24.     On or about September 16, 2003, defendant MILLS caused a wire transfer of $50,011 from a GPOA account at Bank of America to defendant MILLS' UAC account at Bancentro in Managua, Nicaragua.

25.     On or about September 22, 2003, defendant MILLS caused a wire transfer of $40,000 from an account in the name of GPOA at Bank of America, in Florida, to the Polaris account at The Bank of Nevis.

2004

26.     On or about April 7, 2004, defendant MILLS caused an employee to send an email to defendant PURSER with wire transfer instructions for UAC's account at Bancentro.

27.     On or about April 8, 2004, defendants BONCAMPER and MILLS opened an account for United at SKNA National Bank in St. Kitts.

28.     On or about May 4, 2004, defendant MILLS caused a $3,142.42 cashiers check drawn on an account in the name of GPOA at Bank of America, in Florida, to be deposited into the United account at SKNA National Bank in St. Kitts.

29.     On or about June 18, 2004, defendant MILLS caused a wire transfer of $7,780 from an account in the name of GPOA at Bank of America, in Florida, to the United account at SKNA National Bank in St. Kitts.

30.     On or about July 19, 2004, defendant MILLS authorized defendant BONCAMPER to open an account for Commercial at SKNA National Bank in St. Kitts.

31.     On or about July 20, 2004, defendant MILLS sent an email to defendant PURSER, with a copy to defendant BONCAMPER and others, stating in part: "I know you do not agree or understand the emphasis of my suggestion to get All of this OFFSHORE including Bank Accounts ASAP (yesterday) until you get your own Domestic carrier."

32.     On or about October 22, 2004, unindicted co-conspirator C.W., in Houston, Texas, caused a wire transfer of $18,100 from a GPOA account at Bank of America, in Florida, to an account controlled by defendant MILLS in the name of UAC at Bancentro, in Managua, Nicaragua.

33.     On or about November 23, 2004, unindicted co-conspirator C.W., in Houston, Texas, caused a wire transfer of $23,593 from a GPOA account at Bank of America, in Florida, to an account controlled by defendant MILLS in the name of UAC at Bancentro in Managua, Nicaragua.

2005

34.     On or about April 5, 2005, unindicted co-conspirator C.W., in Houston, Texas, caused a wire transfer of $18,973 from a GPOA account at Bank of America, in Florida, to an account controlled by defendant MILLS in the name of UAC at Bancentro in Managua, Nicaragua.

35.     On or about May 22, 2005, defendant BONCAMPER sent an email to defendants

BENTON and MILLS stating: "Hi Ed I forgot to mention that we are having problems with Bank, I think they are blocking these incoming wires. I will have to open a new account at another Bank, The Bank of Nevis International Ltd for this business. Will keep you posted."

36.    On or about May 22, 2005, defendant MILLS responded in an email to defendants BONCAMPER and BENTON that stated: "Irv Whatever needs to be done, I think that it might be better to use the United Assurance Account in Nicaragua?"

37.    On or about May 25, 2005, defendant BENTON asked defendants BONCAMPER and MILLS in an email "Is the banking situation resolved??"

38.    On or about May 25, 2005, defendant MILLS wrote in an email to defendants BONCAMPER and BENTON and another person: "I would suggest let our company UAC do the admin for a fee, and send the money to UAC. Please call Irvin and resolve ASAP, as we have risk and no [way] to accept money in St. Kitts? With more money waiting!"

39.    On or about May 25, 2005, defendant BONCAMPER responded in an email to defendants MILLS and BENTON and another person:

> Yes we are having problems with the account for URIG, from since the last transfer I made for Usd 10,400 about 2 weeks ago an Officer from the bank called me an informed me that the Bank was not satisfied with the account. What she meant was that they did not like funds coming into the account and being transferred almost the same day or 2 days later, she said It appeared like it was money laundering and the bank was concerned about that risk, and she ask me to close the account, This I have not done, but it is my believe that they have since blocked incoming transfer to the account. ..."

40.    On or about May 31, 2005, defendant MILLS sent an email to defendant BONCAMPER that stated: "We need to find another bank and open us accounts asap the business is finally about to flow!"

41.    On or about June 27, 2005, defendant MILLS caused an employee to send an email instructing that "the premium deposits for United Re-Insurance Group" be wire transferred to UAC's

account at Bancentro in Nicaragua.

2006

42.     On or about January 3, 2006, defendant BONCAMPER signed a "Code Word Agreement" and other documents necessary for Brentwood to open an account at Hypo Alpe-Adria-Bank (Lichtenstein) AG in Liechtenstein.

In violation of Title 18, United States Code, Section 1956(h).

### COUNT TWELVE
(Obstruction of Justice)

### A.     INTRODUCTION

1.     The allegations in paragraphs 1 - 31 of the Introduction of this Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

2.     During 2009, the United States Attorney's Office for the Southern District of Texas was conducting a grand jury investigation into the sale of fraudulent liability insurance policies to nursing homes, assisted living facilities, apartment complexes, condominium associations, bars, restaurants and other businesses throughout the United States, including the operator of *Ethan Allen*, a tour boat on Lake George, New York, that sank on October 2, 2005, in an accident that killed twenty elderly tourists.

3.     During the investigation, an agent discovered documents that were purportedly signed in 2003 and 2004 on behalf of United by F.D., a daughter of defendant MILLS.

4.     On October 29, 2009, the agent interviewed F.D.  She told the agent that she had worked for defendant MILLS in approximately 1998 or 1999 for about one year at a company called Surequest Systems, and that her only duty was to answer the phones.  F.D. said that she had never worked for United or any other company that her father owned.  The agent showed F.D. a letter dated February 9, 2004, which listed her as the "Claims Manager" for United.  After looking at the letter,

F.D. insisted that she had not signed the letter and that the signature on the document was not genuine.

5.      On or about November 23, 2009, a federal grand jury subpoena was served on F.D. The subpoena required F.D. to testify before the grand jury in Houston, Texas, on December 2, 2009.

6.      F.D. appeared before the grand jury on December 2, 2009, and testified that the day she received her grand jury subpoena, defendant MILLS told her to call his lawyer, which she did. She testified that the lawyer told her to refuse to testify because she might incriminate herself.  F.D. testified that she agreed, but that after she hung up the phone she just kept thinking that she had not done anything to incriminate herself.

7.      F.D. testified that she stopped answering phone calls from defendant MILLS, and that as a result defendant MILLS wrote her a four-page note.  The first page of the note read as follows:

> [F.D.], Call my attorney Mr. Larry Jarrett [*phone number omitted*] Tell him who you are + what happened   explain about subpoena and see what you can do - to delay or be deposed here because no money + children.

The second page of the note read as follows:

> Basic response at interview is you really do not know about my business  I have tried to get you interested in insurance   have asked you to help on several occasions   you said you would but ended up not, you felt better about dental - - - you do vaguely remember me telling you I wanted you to fill a job in claims and you would get help to learn  I need your bilingual abilities

The third page of the note read as follows:

> In regard to letter & email address you didn't remember clearly - it was quite a while ago I probably told you we needed to send out a letter and have you call the people to get whatever info was needed, you don't remember.

The fourth page of the note read as follows:

> really, but would have and probably said OK, To have sent out letter + to let you know whatever needed to be done - - - - When the investigators first came & hit you with this you were scared - really didn't + couldn't think or recall anything at the time. No you weren't put up to giving this response.

8.      F.D. told the grand jury that what defendant MILLS wrote in the note was "not true". She testified that "I never, never, ever have ever discussed anything about insurance" with defendant MILLS . F.D. testified that defendant MILLS was telling her in the note to testify untruthfully and also to testify falsely that she was not told what to testify.

**B.      OBSTRUCTION**

9.      On or about December 2, 2009, in the Houston Division of the Southern District of Texas, the defendant,

**ROBERT STEVE MILLS,**

did knowingly attempt to corruptly persuade another person with intent to influence the testimony of any person in an official proceeding, that is, the federal grand jury investigating insurance fraud involving the sinking of the *Ethan Allen*.

In violation of Title 18, United States Code, Section 1512(b)(1).


**A TRUE BILL:**

Original Signature on File
FOREPERSON OF THE GRAND JURY


José Angel Moreno
United States Attorney

By:

JOHN R. LEWIS
Assistant United States Attorney


BELINDA BEEK
Assistant United States Attorney